CHARLES H. PAETZ, RESPONDENT, v. LONDON GUARANTEE & ACCIDENT COMPANY OF LONDON, APPELLANT.—71 S. W. (2d) 826.

Kansas City Court of Appeals.   April 30, 1934.

*George W. Eastin* for respondent.

*Brown, Douglas & Brown* for appellant.

TRIMBLE, J.—This is an insured's action on a "Special Automobile Personal Accident Policy—Form AX 4868, limited to Automobile Accidents Only."

Insured's petition alleged that—

"On or about the 5th day of October, 1931, and during the term of said insurance, he was the owner of a certain Ford runabout, which he used as a pleasure car for family use, and that on said date while said car was standing in front of plaintiff's place of business at 1020 South 10th Street, in the City of St. Joseph, Missouri, and while in the exercise of due care upon his part, plaintiff undertook to crank said car, when said car kicked back, reversing said crank in plaintiff's right hand and with the result that said hand and the nerves thereof, and the inner linings over the arteries, veins, muscles and tendons were greatly sprained and bruised and particularly that the arteries, veins, nerves, muscles and other members and parts of said right hand in and about the right wrist and thumb became so injured and bruised that for a period of seventeen (17) weeks after said injuries, plaintiff was totally and continuously disabled from the use of his right hand and the members thereof and of his said right arm to the extent that he was unable to perform any kind of duty pertaining to

his occupation of mattress maker; and that for a period of more than four (4) weeks after the termination of said total disability of said hand and arm, he was continuously partially disabled from the use of said right hand and arm to the extent that he was unable to perform one or more important daily duties pertaining to his occupation as a maker of mattresses.''

The prayer of the petition was for a weekly indemnity of $25 during seventeen weeks of *total* disability, and $12.50 per week for four weeks *partial* disability, aggregating $475, together with ten per cent penalty and a reasonable attorney's fee for vexatious refusal to pay. The trial resulted in a verdict reciting that the jury ''find the issues in said cause for the plaintiff and assess his damages in the sum of $575 (five hundred seventy-five no/100 Dollars):'' From a judgment thereon, the defendant appealed.

The policy, after providing for insurance of $1500 for death, promised a weekly indemnity ''against loss resulting from bodily injuries, effected during the period of this policy through accidental means directly and independently of all other causes, sustained by the Insured.

1. While operating, driving, riding in, demonstrating, adjusting, repairing, *cranking*, or working directly upon an automobile.'' (Italics ours.)

In clause A, the policy provided a ''Schedule of Indemnities'' for ''Death, Dismemberment or Loss of Sight'' and in clause B, relating to ''Weekly Indemnity for Loss of Time,'' it provides that if the injuries shall not result in any of the losses defined in Clause A ''but independently and exclusively of all other causes, shall:

''1. *Total.* From the date of the accident wholly and continuously disable the Insured to the extent that he can perform no kind of duty pertaining to his occupation, the Company will pay indemnity at the rate of Twenty-Five Dollars per week for the period of such disability, but not exceeding twenty-six consecutive weeks;

''2. *Partial.* Or, from the date of the accident, or from the date of the termination of total disability under part 1 of this Clause B, continuously disable the Insured to the extent that he is unable to perform one or more important daily duties pertaining to his occupation, the Company will pay weekly indemnity at one-half rate specified in part 1 of this Clause B, for the period of such disability, but not exceeding four consecutive weeks.''

In Provisions 4 and 5 of Section 2, ''Standard Provisions'' of the policy, it is provided that—

''*Provision 4.* Written notice of injury on which claim may be based must be given to the Company within twenty days after the date of the accident causing such injury. In event of accidental death immediate notice thereof must be given to the Company.

"*Provision 5*. Such notice given by or in behalf of the Insured or beneficiary, as the case may be, to the Company at its Head Office in New York, N. Y., or to any authorized agent of the Company, with particulars sufficient to identify the Insured, shall be deemed to be notice to the Company. Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible."

And under the heading "Additional Provisions" in Provision 22, the policy states—

"This policy does not cover injuries or death:

"(1)   Sustained while  .  .  .   (not pertinent here).

"(2)   Sustained by (a) any paid driver of a taxicab, patrol wagon, fire apparatus, automobile truck or other motor vehicle, or by any person employed to ride in or upon any of the foregoing, or to do manual or mechanical work in the operation, use, care, maintenance, upkeep, repair, adjustment or testing thereof, or (b) any city policeman or fireman during the course of employment, or by any person while working on, cranking, driving, or riding in or upon, any motorcycle, automobile truck, tractor, patrol wagon or fire apparatus, or aircraft of any description, or (e) any automobile mechanic or repairer while engaged in repairing, overhauling or testing any automobile."

The defendant's answer, after specifying the foregoing provisions of the policy, set up three defenses:

1.  That the injuries "did not, from the date of the accident, wholly and continuously disable the plaintiff to the extent that he could perform no kind of duty pertaining to his occupation."

2.  That "written notice of the injury on which plaintiff's claim is based was not given to the Company within twenty days after the date of the accident causing such injury," and

3.  That "if plaintiff was injured, which fact this defendant denies, said injuries were sustained by him while cranking an automobile truck."

Defendant's demurrer at the close of plaintiff's evidence in chief was waived, when, after the demurrer to the evidence was overruled, defendant offered evidence and asked instructions in its behalf. [Davison v. Hines, 246 S. W. 295, 303; St. Louis v. Wright Construction Co., 210 Mo. 491.]

However at the close of all the evidence it again offered a demurrer thereto, and hence the correctness of the court's order in overruling the last demurrer is the open question on appeal, made so by appellant's point 2, charging error in that regard.

The first question, therefore, is, whether the evidence is sufficient

to make it a question for the jury to say whether the injury disabled the plaintiff *from the date of the accident* to the extent that he *could perform no kind of duty pertaining to his occupation?*

In considering this question, remembering that the verdict was in plaintiff's favor, we can look only to the evidence in plaintiff's favor together with all reasonable inferences deducible therefrom, and must accept same as true. If there is any substantial evidence to support the verdict even though meagre and contradicted by defendant's evidence, we cannot disturb the verdict. [Robison v. Chicago Great Western R. Co., 66 S. W. (2d) 180, 186.] Of course, this is on the theory that there is no evidence of plaintiff which, unexplained, flatly contradicts his cause of action. In such situation a plaintiff himself destroys his own case, but that is not the situation here.

The evidence in plaintiff's behalf is that the accident causing the injury occurred on or about October 5, 1931; that about 4 o'clock of that day when plaintiff started to go home the engine was cold, the car having stood at plaintiff's place of business since 9 A. M. and the day was chilly; that in trying to crank his car the engine "backfired" and plaintiff's right hand was bruised in the fleshy part of the palm "in a circle from the thumb around the forefinger into the palm of the hand." For several minutes the pain was very severe but after massaging the hand, the pain "kind of died down" and plaintiff then cranked his car and went home. That night his hand was treated with liniment several times, but in the morning the hand was "still sore" and liniment was again used and then the thumb was painted with mercurochrome. The pain was in his hand, and "a couple of days later" there was nothing visible on his hand and he could not locate the seat of his trouble, but when plaintiff pulled his finger back he found a black spot and the pain "was right in the center of the palm." He put a flaxseed poultice on it; the hand was swollen, "very painful and there was a throbbing sensation like a person had a sore tooth and it kept jumping like that." Thereafter he went to Dr. Geiger who lanced, or cut it open, "right in the palm of the hand." The cutting relieved the pain somewhat and some pus came out. This was on Saturday and Dr. Geiger told plaintiff to come back on Monday. The hand was getting worse and he (Dr. Geiger) opened up the whole palm of his hand and took a crooked instrument and "gouged it around and opened it; when he did that the corruption came out." Plaintiff's whole hand was swollen and two large (red) streaks were up his arm. Plaintiff had fever and could not lie down but had to sit up three nights. He was very nervous. If he sat down he would get up and walk around. Dr. Geiger lanced it three times, the two first times in the palm of the hand, and the third time, about ten days after the first operation, he lanced the back of the hand. The

doctor continued to treat the hand for "fully two months." Plaintiff says the injury continued from the date of the accident, October 5, 1931 (so that he was "unable to use the hand at all," total disability), until February 5, 1932, when he returned to work—a period of seventeen weeks and four or perhaps five days, which are that much more than the number of weeks total disability sued for.

Dr. Geiger, a physician and surgeon of many years' experience in St. Joseph where the accident occurred, testified that plaintiff had a "palmar abscess, swelling, infection and the formation of pus producing the condition that is scientifically known as palmar abscess." It is always serious. He says he cut it open three different times on the palmar surface and once on the back part; the hand was enormously swollen and the swelling extended up to the under arm; this is always characteristic of that type of injury. It keeps on forming pus if it is not relieved, and now and then a person loses his life. This injury is found almost altogether among laboring men, those that use axes, hammers and such. The doctor further testified that plaintiff came to him October 11; the hand was "enormously swollen" at that time. Plaintiff told him "about cranking a car." The doctor treated him for two months. At the end of that time the "hand was still crippled and (he) could not open his fingers any more than that (Indicating). His arm at all times was in a sling. The manifestation of pain, fever and infection existed from the time of the injury. From the time I saw him to the end of two months he was incapacitated from work, totally so." At the time of the trial (December 2, 1932), owing to adhesions, he (plaintiff) had not perfect use of the hand. "I believe however after another six months he may have perfect use. . . . Now, he cannot bring down his fourth finger completely."

Plaintiff also testified that from the time of the accident he was unable to use the hand at all, was totally disabled for seventeen weeks; that he never took up his work of making mattresses thereafter; but he did attempt to do some upholstering for a furniture company, and found he could not grip small tools nor use a large hammer; that he can now get his fingers only about half closed; all that he did was to go back and forth from the business to get checks; that he didn't even open his mail, merely looked in the small box and took the mail inside. During the first twenty days after the injury he was not in a condition to attend to any business or to give any notice; he was sick, had high fever, and chills, didn't go to bed for three nights, sat wrapped up in blankets and bathrobe with a pillow on his lap with hot water bottle all that day and night trying to keep his hand comfortable and didn't leave the house for four or five days. On cross-examination, he was asked concerning a deposition he had given in the

case as to the work he did between the time of the injury and the time he went to see Dr. Geiger. But he testified that the questions were transposed so that they didn't fully express his meaning in the answers he had given; he didn't make a mistake in those answers. "I didn't understand you or you didn't understand me." As to his answer that he didn't work for two days before he went to Dr. Geiger, he says he didn't work two days or four days, he didn't work *any time* in October. As to his answer that he "was working" during the period of five or six days before going to the doctor, he testified that his answer was, "No, I was not; just going back and forth to the office;" and that when he saw, for the first time, the above answer in the deposition he had changed it. And at the trial he testified there were "about fifteen mistakes made" in the deposition, "but I said I never worked" in answer to the questions were asked. He testified at the trial he was never able to work; that he cranked the car once but "didn't try it after that. I cranked it twice the following day with a great big rag in my hand." He also testified that the deposition was taken in the office of an attorney for the defendant; that there was the ordinary noise of cars and wagons passing, that his hearing was not very good, especially in his left ear, and while he didn't say he didn't understand any of the questions "but a lot of them I didn't understand." The plaintiff's testimony as to the taking of the deposition and the conditions under which it was taken and the mistakes therein were contradicted by the stenographer in the office and who took the deposition, but of course, these matters were for the jury to pass upon, and are not open to us for our consideration. There was sufficient evidence to enable the jury to find that plaintiff's disability was total *from the date of the accident*. [Wall v. Continental Casualty Co., 111 Mo. App. 504; Foglesong v. Modern Woodmen of America, 121 Mo. App. 548; Katz v. Union Central Life Ins. Co., 44 S. W. (2d) 250.] It is true, the condition in the policy here involved is that insured must "from the date of the accident," be disabled to the extent that he is "unable to perform one or more important daily duties pertaining to his occupation" which is no doubt stronger and more exacting than some of the conditions in the cases which upheld the insurance sued for therein, but the proof in the case at bar is likewise stronger and more exact so as to meet the condition required herein. The fact that insured went to his place of business, carried his mail from the mailbox into the business house, but was not able to open it, and tried to crank his car one or more times, but succeeded once with the aid of huge rags in his hand, was not the performance of important duties pertaining to his occupation so as to invalidate the policy on the ground that he was not totally disabled from the time of the accident. The evidence in this case, we

think, is so far different from the cases of Martin v. Travelers Ins. Co., 276 S. W. 380, and McDavid v. Business Men's Assur. Co., 6 S. W. (2d) 337, as to render them and the other cases cited on this feature of the case at bar, inapplicable or not in point.

The next point urged in support of the demurrer is that no written notice of the injury was given within twenty days after the date of the accident. Provision 5 states that "Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible.

While the provision does not, of itself, do away with the necessity of such notice, yet it is manifest that notice within twenty days is not a cast-iron, rigid rule, but is one that is to be regulated and governed by the circumstances surrounding and attending the condition of insured during the twenty days, and hence it may be regarded as having a *tendency* to cause the company to look with some degree of leniency on the circumstances, or to waive the failure to give such notice within that time. Now while the evidence may show that it might have been *possible* for plaintiff to have given *written* notice *immediately* after the injury, yet it is clear that he could not do so in a very short time thereafter. The fact that he states he could have telephoned to the local agency, has no tendency to show he could have given the notice required because that would not constitute *written* notice. It is true that plaintiff says he thought the policy ran only from year to year and that a new policy was required for each succeeding year. He overlooked the fact that a clause in the policy provided that it could be renewed by the payment of another premium, and, as the accident occurred during the second year, he was under the impression that the policy had expired, until an insurance agent for other kinds of insurance, examining the policy herein, upon plaintiff saying he *had* had accident insurance but that it had run out, called his attention to the above mentioned clause in the policy and to the fact that the second year's premium had been paid, so that the policy was still in force. We are unable to agree with the appellant's contention that the *only* reason stated by plaintiff for not giving notice within the twenty days, was that he did not know he had the policy, or, which is the same thing, that it was still in force. We think that his evidence, as a whole, shows he also gave as a reason "the fact that I was sick and didn't know my business." While the failure to know that the policy was still in force when the accident happened would, under ordinary circumstances, be no excuse for failing to give notice within the twenty days, yet under Provision No. 5 as to failure to give notice if "reasonably possible," the evidence is such as to make it a question for the jury to pass upon, especially as about thirty days after the accident

and as soon as he found his policy was in force, he went to the office of the company's local agency and made a report. But be all this as it may, there is, we think, evidence from which the jury could find that lack of notice within twenty days was waived.

The evidence in plaintiff's behalf shows that, as soon as he discovered the policy was in force he went to the local agency office and orally reported the accident but could not make out a written report on account of the condition of his hand. He was told by the stenographer to return again when one of the firm was in; when plaintiff reached home one of the firm had returned to his office and had telephoned to plaintiff's home leaving word that if plaintiff were well enough the next day *and the weather permitted,* to come up and make a report of the accident. Plaintiff did so and met one of the firm who asked, ''Why didn't you come sooner, you should have been here twenty days after the time you were hurt?'' And upon plaintiff replying that he didn't know the policy was in force until the day before and he couldn't possibly tell him, to which the agent replied, ''We will just waive that part and make the report to the company,'' and then the report was brought to him by the young lady stenographer with a pen for him to sign, and he told her he couldn't on account of his hand whereupon she took the report away and finally came back and said ''Sign it,'' and he said, ''I cannot write,'' and upon her asking him again to sign it he said to her, ''If you have to have the signature, you sign it for me and I will make a cross,'' and that was done. During the first twenty days he testified, as hereinbefore related, he was not in a condition to tend to any business of any kind or to give any notice; ''I was sick and had high fever and chills and very nervous and didn't even leave the house for several days.'' About a week after he made the report of the accident he got a letter from the agent asking plaintiff to come to the office ''and sign some papers waiving certain rights I had in the company.'' He went but refused to sign any papers and said ''that I would not waive any rights I had in the company.'' He told them that if it were necessary for them to have his signature he ''would go before a notary public and give him power of attorney to sign my name to anything that was necessary, and he (the agent) said, 'We can settle this between ourselves and don't need a notary public.' '' Later, on the following day, the agent was insisting on plaintiff to sign some papers which insured refused to do and plaintiff said to the agent ''what are you trying to put over on me? If I have violated any part of the policy on my part, say so, and let's get it over with! He said, 'This policy is good and we are going to settle with you to your satisfaction' and I said 'Well, get busy,' and I left the office at that time.'' This was on the second day he was at the office. About a week or ten days later he had another conversation with the agent in which plaintiff refused

tc sign what the agent wanted him to sign, and started out, and on his way to the door he said to the agent, "If this policy is no good and if I have lost my claim in this policy by not making the report in twenty days, say so." To which the agent replied, "You have not lost your claim and it will be adjusted to your satisfaction." About two weeks later, plaintiff received a letter from the agent, dated January 11, 1932, saying—

"If you are at leisure within the next day or so between 1:30 and 2 in the afternoon, I will be glad to go over your personal accident claim with you, since I have received further information from the company."

*Prior* to this, he had received a letter dated *December* 14, 1931, from the agent, saying—

"Dear Mr. Paetz:

"The company has requested that you appear before our regular physician for an examination in regard to your claim for personal injury.

"Consequently, please call at the office of Dr. Gregg Thompson at 9th and Charles Streets, after calling him at 6-0925 and making an appointment, so that he can examine your injury and make out our usual report."

Plaintiff's evidence further discloses that on April 8, 1932 (about two months and twenty-six days after the first letter above mentioned was written and three months and twenty-four days after the second above mentioned), plaintiff received from the agent a letter saying—

"Dear Mr. Paetz:

"In regard to your claim for disability under "AX" policy, wish to advise that our home office has instructed us to refuse payment of any disability under this policy. We are therefore, denying liability *by reason of the fact that your injuries and disability were occasioned by the cranking of a Ford truck.* Under provision No. 22 of your policy you will see that it specifically 'excludes coverage to any person while working on, cranking, . . . any motorcycle or automobile truck.'

"Had you advised us in the beginning that the disability begun as a result of cranking an automobile *truck,* we would have immediately denied liability. (*We are therefore, withdrawing any offer of settlement which may have been made heretofore."* (Italics ours.)

This would seem to clearly show that liability was *not* denied because of failure to give notice in twenty days but on the ground that he was injured while trying to crank a *truck.* Hence the failure to give notice within twenty days was not the ground for refusal to pay, and therefore, if this might have been a defense under the circumstances surrounding plaintiff after the accident, it was waived. [Fink v. Lancashire Ins. Co., 66 Mo. App. 513; McIntyre v. Liverpool, London, etc., Ins. Co., 131 Mo. 88; Pelkington v. The National Ins. Co., 55

Mo. 172; LaForce v. The Williams City Fire Ins. Co., 43 Mo. App. 518; Loch v. The American Central Ins. Co., 99 Mo. 50; McCullough v. Phoenix Ins. Co., 113 Mo. 607; Ball v. Royal Ins. Co., 129 Mo. App. 34; Probst v. Insurance Co. of North America, 64 Mo. App. 484.] The court would not have been justified in sustaining a demurrer to the evidence on the ground of plaintiff's failure to give written notice within twenty days after the accident.

Should it have been sustained on the third ground alleged by appellant, namely, because the car was an automobile *truck?* We think it should not.

The evidence discloses that it was registered and licensed as a "Ford" and described as "Rubt" which is an abbreviation for "Runabout." It was used as a family car, but *occasionally* the "turtle back" was removed and a platform placed thereon and fastened thereto by two bolts and was used for delivering mattresses. Defendant agents knew this car, and of this use of it, for some thirteen years before the accident and had written insurance on it as a runabout and at times had seen the car with the temporary platform on it. It was also shown that the car in question had no lettering on it which is the case with all pleasure cars, but that trucks always have this designation on them. The bill of sale from the company from which plaintiff bought the car designates it as a runabout. There was no basis for the sustention of the demurrer to the evidence because of the claim that the car was an automobile truck.

As heretofore shown, there was, as we think, evidence from which the jury could have found that it was not "reasonably possible" for plaintiff to give written notice of the accident within twenty days; hence the refusal to give defendant's instruction C which sought to tell the jury there was no such evidence, was not error. But be this as it may, how could the refusal to give the instruction constitute reversible error when, as we have said, the notice within twenty days was waived?

The same is applicable to appellant's point 4 as to error in giving plaintiff's instruction 2 which told the jury that if it found that it was not reasonably possible to give the notice in twenty days, then the failure to give such notice would not prevent plaintiff's recovery. This was likewise not reversible error.

There was no error in giving plaintiff's instruction No. 1 embodying his case. The issues were clearly set forth and every element of the case, including the defenses of defendant, were included and submitted. Appellant's objection to this instruction merely embody, in another form, the same contentions made with regard to the insufficiency of the evidence asserted as justifying defendant's demurrer to the evidence.

Error is predicated on the giving of plaintiff's instruction No. 3

which told the jury, in effect, that if defendant "made offers to compromise plaintiff's claim" they could consider such offer on the question as to whether defendant waived the giving of the notice in the twenty days required. While we do not commend the form of this instruction, it is not seen how it can be regarded as reversible error. The *evidence* does not show these offers as offers of compromise, but were offers to pay for one week *total disability* ($25) and two weeks *partial disability* ($12.50 per week) or $75 in all. So far as the evidence discloses, this was not made as a compromise, but as an admission of *liability* for loss of time to that extent. As said in Lance v. Royal Ins. Co., 259 S. W. 536, "there is nothing in this testimony to indicate that the offer of defendant to pay one-half of the amount of the policy was made as an offer of compromise or for any other reason than as a direct admission of liability for the amount offered." It is true that in a conversation with the Company's adjuster, had about a week or ten days later, the suggestion was made that plaintiff take $150 which plaintiff would not accept, and the adjuster was asked concerning his authority, said he "could make a settlement personally but the company would have to O. K. it." But this does not have the effect of destroying what the members of the local agency did. An offer to unconditionally pay for one week's total disability is competent evidence or a circumstance that the failure to give the required notice was waived. [Stavinow v. Home Ins. Co., 43 Mo. App. 513, 518.]

In various ways defendant has raised the point that it was error to submit to the jury the question of vexatious refusal to pay. After considering this point thoroughly, we have come to the conclusion that this should not have been submitted. Whether a refusal or failure to pay is vexatious or not, must be determined by the situation as presented to the defendant at the time it was called on to pay. If the situation and circumstances, thus presented, are sufficient to raise in the mind of a reasonable man a doubt or question as to liability, the defendant should not, in effect, be denied the right to *freely* litigate the matter. This is done whenever, in such case, the penalty of the statute is invoked and imposed. The matter of whether the accident disabled the insured *from the date of the accident* is certainly one of the questions which could well raise such a doubt; and the state of the evidence on the above issue shows it was such a matter that only the verdict of a jury could properly settle or determine. Next, the question of not only the beginning of the total disability claimed, but the length of time it and the claimed partial disability existed were also puzzling and disputed issues, some part of which was caused by what plaintiff himself said and did; of course this was *explained* by him in the course of the trial, at least to the satisfaction of the jury. but this only emphasizes the justification defendant had,

and its right to litigate the questions involved, without being penalized for so doing. This view dispenses with the necessity of passing on other points of claimed error raised by defendant, among them that the verdict being merely for a lump sum with no mention of vexatious delay, penalty or attorney's fee, is at least irregular. It would seem that, properly, the verdict should have stated these matters other than by merely giving a lump sum in excess of the amount claimed as due under the policy. The statute, Section 5929, Revised Statutes 1929, in mentioning the "aggregate sum" for which court may regulate judgment, indicates that it contemplates that the jury should state the various amounts it allows on these items. Were it not for the fact that the court, in its instructions given to the jury on vexatious delay, told them that if they found such delay, they could add only the sum of $100, agreed upon in that event by the parties in open court, we would be unable to say that the verdict found was for the full amount sued for and that the excess above that was for vexatious delay. But since it was "agreed upon in open court" that, if the jury found vexatious delay, they could add only $100 to their verdict on the cause of action, and the court told the jury this, we take it as apparent that the jury found for the full sum sued for on the cause of action, i. e., $475.

The above in effect disposes of all the questions raised on appeal. If, therefore, the respondent will within ten days from the announcement of this opinion, file a remittitur of $100 and interest which may accrue thereon from the date of judgment, it will, for the reduced amount be affirmed, otherwise the cause will be reversed and remanded. It is so ordered. All concur.